OPINION. Oppek, Judge-. Placing upon the operative events the construction most favorable to petitioner, the most that can be said is that a desire arose on the part of the principal stockholders to get their money out of the business, but that conditions prevented an outright sale to outsiders. Much of the significant detail remains a mystery,[1] but we know that a plan was' suggested and ultimately carried out by which the corporation acquired most of the stock of two of the stockholders, and subsequently the third, at an identical figure, and that there then remained at the disposal of petitioner his identical proportion of the original interests in the enterprise. No benefit accrued to the business nor is one even suggested.[2] There was a large earned surplus and an unnecessary accumulation of cash, both of which were reduced as they would have been by the declaration of a true dividend. The business did not curtail its operations nor enter upon a program of liquidation. By all of the tests this transaction is governed by section 115 (g).[3] The redemption was not dictated by the reasonable needs of the business, but originated with and was designed for the benefit of the stockholders who received its fruits. A. E. Levity 43 B. T. A. 1077. The reduction in the capitalization was not to bring it to a figure more nearly approximating the value of the assets nor to create a surplus. The company did not contract its business. Elwood W. McGuire, 32 B .T. A. 1075, affirmed (C. C. A., 7th Cir.), 88 Fed. (2d) 1013. There was no other suggested purpose such as the creation of a stock pool for employee purchases, and the company had no record of prior distributions of earnings. Cf. Fred B. Snite, 10 T. C. 523, affirmed (C. A., 7th Cir.), 177 Fed. (2d) 819. And if we borrow the language of Judge (now Chief Justice) Vinson in Flanagan v. Helvering (C. A. D. C.), 116 Fed. (2d) 937, 939: “But the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering § 115 (g),” we must likewise conclude that the identical result would have been accomplished (except for the hope of saving taxes) by the outright declaration of a cash dividend. Much is made of the suggested inequality of the distribution as among the stockholders. The contention is not impressive on either the law or the facts. Legally it is not alone distributions which are true dividends to which the section applies. “* * * this theory assumes that the distribution must in fact meet the legal test of a dividend to fall within section 201 (g) [the predecessor-of 115 (g)]. If this were sound, that provision of the statute would be surplusage, as such a dividend would be taxable under other provisions. Cf. United States v. Katz, 271 U. S. 354. The purpose of this section is to tax distributions which effect a cash distribution of surplus otherwise than in the form of a legal dividend * * Shelby H. Curlee, Trustee, 28 B. T. A. 773, 782, affirmed (C. C. A., 8th Cir.), 76 Fed. (2d) 472, certiorari denied, 296 U.. S. 599. In addition, however, the record implies, and we are certainly not persuaded to the contrary,[4] that the distribution to Tiffany was no more than simultaneous with his disposition of his remaining shares.[5] That would leave the two principal stockholders (or the assignee of one) with the same proportionate interest after the distribution. Similarly, the fact that the payment to the Glover Estate, although it had to be delayed for technical reasons, was eventually at the same price per share to the penny and for almost the same number of shares,[6] is at least suggestive that the subsequent distribution was pursuant to a pre-arranged agreement. Although it took something over a year to accomplish, the upshot was, as our findings show, that a corporation, with three principal stockholders holding their shares in virtually equal proportions, distributed to them the bulk of its accumulated earnings and that ultimately there remained three shareholders again with identical holdings. The transaction has too many appearances of being interrelated parts of a single operation for us to discard the suggested test of the Flanagcm case as to the “net effects of the distribution.” So approached, it is not merely “essentially equivalent,” it is identical with the distribution of an ordinary dividend. _____ We need not here, any more than has been done in a number of other situations, determine whether under such circumstances every deposit' in the corporate treasury is a redemption.[7] It suffices to say that there was evidently no intention here of reissuing the stock, and it seems to have been permanently acquired and put to rest in the treasury for all practical purposes as truly as though the number of shares had been formally reduced. See Dr. Pepper Bottling Co. of Mississippi, 1 T. C. 80, 84. No adequate grounds have been advanced by petitioner, upon whom the burden lay, George Hyman, 28 B. T. A. 1231, affirmed (C. A. D. C.), 11 Fed. (2d) 342, certiorari denied, 293 U. S. 570, to persuade us that this was not, as determined by respondent, the essential equivalent of the distribution of a taxable dividend within the meaning of section 115 (g)- Decision will he entered for the respondent. For example, it is repeatedly emphasized that one of the other stockholders, Tiffany, gave up his rights in the remaining shares. We are not apprised of the reason he did so, his explanation being that it was to compensate the attorney who represented the company and himself, the attorney’s explanation being that it was a “gratuity” to him, but neither shedding adequate light on the question of whether Tiffany could not as well have continued to hold the stock for all that appears as to the accomplishment of any purpose of the whole transaction. This is not to say that an explanation is necessary since petitioner could have received the equivalent of a dividend without proportional participation by the remaining stockholders. J. Natwich, 36 B. T. A. 866, 874. The desire of Tiffany to withdraw from active participation is emphasized. Tiffany testified: “I disagreed with the management and the management disagreed with me. * * * I felt that the only solution for me, at any rate, was to sell my interest in the company. That I found was impossible. Outside interests would not buy my share alone. They would buy only all of the outstanding stock.” (Emphasis added.) That, however, sheds no light on the simultaneous and'identical payment by the company to petitioner who not only did not retire from the company but became its president and apparently continued in that capacity for a number of years until dissolution. “SEC. 115. DISTRIBÜTIONS BY CORPORATION. ******* “(g) Reoemption of Stock. — If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.” It is stipulated that: . “13. The stockholders of record of Air Cruisers, Inc. and the number of shares held by them subsequent to December 13, 1943, are as follows: From December IS, 19íS, to December 18,191/S James E. Boyle_ 300 Shares Earl E. Glover_ 3,501 “ Carter Tiffany_ 300 “ H. Preston Morris_ 100 Treasury Stock_ 6,504 “ 10, 705 Shares From December 18,191/S, to May 16,191/1/ James E. Boyle_ 300 Shares Earl E. Glover_ 3, 501 Carter Tiffany_ 300 “ Thomas P. Vaughan_ 50 “ Harry A. Gerrish_ 50 “ Treasury Stock_ 6,504 “ 10,705 Shares” Mr. Tiffany was asked : “Q. Vou had just sold 3,202 shares of stock for $62.67, at the same time you gave this option to Mr. Gerrish for ten cents a share, is that correct ? “A. That is right. “Q. was that compensation to Mr. Gerrish for producing sale oí your stock? “A. That is how I considered it.” Glover, 3,301 shares ; Tiffany, 3,202 shares ; petitioner, 3,302 shares. “Webster’s New International Dictionary defines the word ‘redeem’ as, ‘To regain possession of by payment of a stipulated price; to repurchase. (2) To recover-,or regain, as pledged or mortgaged property * * *. (3) To buy off, take up, or remove the obligation of, by payment or rendering of some consideration.’ “The word ‘redemption’ has its origin in the Latin words ‘re’ and ‘ém¡ers’ and means to repurchase or to regain possession by payment of a stipulated price. Murphy v. Caselman, 139 N. W. 802 (N. D.); Maxwell v. Foster, 45 S. E. 929; Pace v. Bartles, 20 Atl. 352 (N. J.); Miller v. Ratterman, 24 N. E. 496 (Ohio). Considering the word ‘redeem’ in the light of the above definitions, the corporation involved here redeemed the stock from the petitioner. It acquired it back or repurchased it. The statute does not refer to ‘retirement’ of stock. If the statute had used the expression ‘cancels or retires’ the stock there would be another question. But the contention of the petitioner is that ‘redeems’ or ‘redemption’ means ‘retires’ or ‘retirement.’ We do not think the statute should be so limited. * * *” James D. Robinson, 27 B. T. A. 1018, 1021, affirmed (C. C. A., 5th Cir.), 69 Red. (2d) 972. See also J. Natwick, 36 B. T. A. 866; Lowenthal v. Commissioner (C. C. A., 7th Cir.), 169 Fed. (2d) 694; cf. Kirschenbaum v. Commissioner (C. C. A., 2nd Cir.) 155 Fed. (2d) 23.